## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action File No.** |
| **v.** | |
| **HOPE ADVISORS, LLC, and KAREN BRUTON,** | |
| **Defendants,** | |
| **and** | |
| **JUST HOPE FOUNDATION,** | |
| **Relief Defendant.** | |

## <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1.      This enforcement action arises out of a fraudulent scheme to generate fees by Hope Advisors, LLC ("Hope"),  a registered investment adviser, its

principal, Karen Bruton, (collectively, "Defendants").  Hope managed the account

of two private investment funds, Hope Investments, LLC (the "HI Fund") and

HDB Investments, LLC ("HDB") (collectively, the "Funds").  Hope's only

compensation for managing the funds came in the form of an incentive fee,

calculated as a share (10% for the HI Fund and 20% for HDB) of the profits

earned in the Funds' accounts.

      2.     The HI Fund and HDB employed a "high-water-mark" fee structure

pursuant to which Hope was entitled to no fees unless the Funds made profits that

exceeded past losses.  In other words, all prior losses needed to be made up before

Hope would be paid.  Since at least November 2014, Hope and Bruton have

engaged in a continuous pattern of fraudulent trading to circumvent the impact of

the high-water-mark fee structure.  The fraudulent trading exploited the HI Fund's

obligation to calculate the incentive fee exclusively on the basis of monthly

"realized" gains and losses—"unrealized" gains and losses (i.e., those attributable

to open trading positions at a month's end) were not included in the fee

calculation.[1]

3.      Each month, Hope caused the Funds to make certain "Scheme Trades" that had the purpose and effect of realizing a large gain in the current month while effectively guaranteeing a large loss would be realized early the following month.   In essence, these trades continuously converted any realized losses into realized gains in the current month, and losses which would be realized in subsequent months, except that they would be continually deferred by the Defendants engaging in additional Scheme Trades.  The Defendants did not simply delay realization of trading losses, however, they also intentionally sized the Scheme Trades such that the Funds realized a profit every month.  Hope employees maintained a spread sheet that tracked, month to date, the realized losses of the Funds.  As the end of each month approached, Bruton picked the amount of profit she wished the Funds to show (and de facto, the fees she wished to generate), and her traders would size the Scheme Trades accordingly.

4.      Without the fraudulent Scheme Trades, Hope would have received almost no incentive fees from at least October 2014 through the present.  Instead,

---

[1] As alleged below, HDB's operative documents actually called for the incentive fee to be calculated in a different manner.   Nevertheless, in practice, Hope calculated the fee for HDB in (continued…)

Hope extracted millions of dollars in incentive fees.  In recent months, Hope has been using the Scheme Trades to avoid realization of more than $50 million in losses, while still earning large monthly incentive fees.

5.     In addition to the incentive fee paid to Hope by the HI Fund, the fund paid a 10% incentive fee to the Just Hope Foundation (the "Hope Foundation"), which in turn funded Just Hope International (the "Hope Charity"), a charity founded and run by Bruton.  The Hope Foundation and its employees (aside from Bruton) were not involved in the fraudulent trading scheme, however, it did not provide any goods or services to the HI Fund in exchange for the incentive fees the Hope Foundation was paid.  Accordingly, the Hope Foundation was unjustly enriched and is a Relief Defendant in this action.

## DEFENDANTS

6.     **Hope Advisors, LLC ("Hope")** is a Tennessee limited liability company formed on March 23, 2011, and serves as a commodity pool operator and trading manager.  Hope is wholly owned by Karen Bruton, and is the investment adviser to the HI and HDB Funds.  Hope has been a Commission-

_____

(...continued)
the same way it calculated the fee for the HI Fund.

registered investment advisor since July 2013.  Hope  is registered with the
CFTC as a commodity pool operator and became a member of the National
Futures Association in such capacity in January 2013.  On April 15, 2015 the
CFTC entered an order against Hope finding violations of Section 4m(1) of the
Commodity Exchange Act (requiring commodity pool operators to register)
and Regulation 4.22(d) thereunder (requiring commodity pool operators to
disclose pool participants of both realized and unrealized gains and losses).

7.      **Karen Bruton** is the owner of Hope Advisors, LLC.  Bruton is 66
years of age and is a self-taught options trader.  Formerly, she worked as a
corporate executive.  She has an inactive CPA license.  While Hope employs
three traders in addition to Bruton, Bruton approves all trades, including the
trades that are at issue in this matter.

**RELIEF DEFENDANT**

8.      **Just Hope Foundation (the "Hope Foundation")** is a tax-exempt
Section 501(c)(3) private foundation formed in Tennessee in 2011. Bruton is its
President.  Hope Foundation is a private grantmaking entity that supports the
Hope Charity, a charity founded by Bruton.  Hope Foundation receives 50% of
the incentive fees earned by Hope from the HI Fund.  As of year-end 2014, the

Hope Foundation had assets of almost $10 million, most of which is invested in the HI Fund.

## OTHER RELEVANT ENTITIES

9.     **Hope Investments, LLC (the "HI Fund")** is a privately offered, single manager fund offered by Hope to accredited investors as that term is defined under Section 4(a)(2) of the Securities Act of 1933 ("Securities Act") and Rule 506 of Regulation D promulgated thereunder.  The HI Fund is a Tennessee limited liability company that was formed on February 16, 2011. The HI Fund is not registered as an investment company under the Investment Company Act of 1940 in reliance on Section 3(c)(1) thereunder, since it will not admit more than 100 beneficial owners.  As of February 29, 2016, the net asset value ("NAV") of the HI Fund was $136 million.

10.     **HDB Investments, LLC (the "HDB FUND")** is a Tennessee limited liability formed in April 2008.   Since approximately 2013 the Fund was a single investor investment vehicle. In approximately March 2016, the HDB Fund's sole investor placed the HDB Fund's entire net asset value, approximately $65 million, into the HI Fund.  The HDB Fund is no longer operating.

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act, [15 U.S.C. §§ 77t(b) and 77t(d)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)], and Sections 209(d) and 209(e) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(b) and 80b-9(d)].

12.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14(a)].

13.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

14.     The Defendants have consented to venue in the Atlanta Division of the Northern District of Georgia.

# FACTS

## A.    Background

15.    Karen Bruton, a CPA, spent more than 25 years as a vice president and corporate controller, most recently with a Nashville, Tennessee-based private corporation that produced limestone.  Sometime prior to her retirement in 2007, Bruton began to take online and other training courses in options trading.

16.    In 2008, Bruton organized the HDB Fund as an investment vehicle to trade options for herself and approximately five other investors.

17.     The largest and primary investor in HDB Fund was a wealthy individual ("Investor A").  Ultimately, Investor A became the sole investor in HDB Fund.

18.    In 2011, Bruton organized the HI Fund to expand her ability to invest the funds of family and friends.

19.    Bruton also founded Hope to provide advisory services to the HI Fund and HDB Fund.

20.    Bruton's and Hope's trading in the two funds was very similar and primarily consisted of trading in (1) options, (2) options on futures, and (3)

-8-

futures, tied to broad-based market indices such as the S&P 500, Russell 2000 and NASDAQ 100.

21.     The general trading strategy for both Funds was to sell options with the goal of having them expire "out of the money," allowing the Funds to profit from the proceeds it received from selling the options. The HI Fund's offering documents state that it trades 50-60 days out and within two standard deviations of the market that the options are based upon.

22.     The HI Fund had an NAV of approximately $136 million as of February 29, 2016.

23.     As of the same date, the HI Fund had unrealized losses of approximately $57 million.

24.     The HI Fund had unrealized losses at the end of every month for at least two years, with the amount fluctuating between $3 million and $62 million.

25.     The minimum investment in the HI Fund is $250,000.  The investment is termed the investor's "capital account."

26.     According to the HI Fund documents, including its private placement memorandum, only realized gains and losses affect the capital

account and only realized gains and losses affect the amount of any investor's redemption from the HI Fund.

27.     Until approximately August 2013, Hope only reported this realized capital position to investors.  At that time, Hope was notified of certain investor reporting and other deficiencies resulting from an audit by the National Futures Association.  Hope then began to also provide each investor a statement of his or her share of the Funds' net asset value (which includes unrealized gains and losses).

28.     Unlike the fee structure used by many investment advisers, Hope does not charge the Funds a management fee based on a percentage of assets under management.

29.      Instead, Hope shared in any net realized gains earned in either Fund in a given month by deducting an incentive fee equal to 20% of net realized gains during the month.

30.     Half of the incentive fee for the HI Fund (i.e., 10% of net realized gains) went to the Hope Foundation.

31.     The operative documents of the Funds provided that if the Funds suffered losses, Hope would receive no fee and would receive no fees in

subsequent months until the losses has been offset by gains (the so-called "high water mark" restriction).

32.     Hope excluded unrealized gains and losses for purposes of calculating the incentive fee.

33.     Hope charged the HI Fund incentive fees in every month throughout 2014 and 2015.

34.      In the summer of 2015, Hope caused the HDB Fund to realize its losses.  This resulted in more than a $30 million decrease in the "capital account" of Investor A.  Hope ceased collecting an incentive fee at that time, and in the spring of 2016, Investor A transferred the funds in HDB Fund into the HI Fund.

**B.     The HI Fund's Private Placement Memorandum**

35.     Potential investors in the HI Fund are provided a private placement memorandum ("PPM").

36.     The PPM discloses that the fund will pay an Incentive Fee based on 20% of *realized* profits (with 10% going to Hope and the other 10% going to the Hope Foundation).

37.     The PPM also notes the high-water-mark structure of the fee

agreement, stating, in part, as follows:

> For the avoidance of doubt, any loss by the Fund in any month is made up "dollar for dollar" to the investors before the Incentive Allocation is paid again on New Trading Profits made on the Fund's trades.

38.     The PPM discloses that the fee structure gives Hope an incentive to defer realization of losses, however it immediately minimizes the risk that losses could be deferred for any substantial period of time.

39.     Specifically, the PPM states as follows:

> **Incentive allocations may be paid by the Fund Even Though the Fund Is Experiencing Unrealized Trading Losses.** . . . [I]t is possible that the Fund will pay an Incentive Allocation on New Trading Profits even though there are unrealized losses on open positions. Thus, there is an incentive for the Investment Adviser to realize gains and defer realization of losses; however due to the type of trading in which the Investment Advisor engages, it is unlikely that the Investment Advisor will be able to defer realization of losses on positions for any extended period of time since most trades into which the Investment Advisor enters will only be open for 30 to 90 days at maximum.

40.     When an investor withdraws from the fund, unrealized gains or losses are excluded. This is disclosed in the PPM, which provides as follows:

> A Withdrawing Member receives only his or her pro rata portion of Net Realized Profits or Losses at the Withdrawal Date and will not Participate in Unrealized Gains or Losses. . . .

Following such a withdrawal by a member, all other Members remaining in the fund after the withdrawal date will receive the benefit of any gains realized subsequent to the Withdrawal date; however the Members remaining in the Fund will also participate in any losses subsequently realized on positions that were outstanding as of that Withdrawal Date and closed after the Withdrawal Date.

41.     At the end of each month, Hope sends account statements to each investor in the HI fund.

42.     The first page of that account statement shows realized gains for the month and year to date, the monthly and year to date incentive fee paid on those realized gains, and the change in the realized gains and loss, both for the month and year to date.  Since 2013, a small box on the second page also shows the NAV of the investor's account and his or her share of the unrealized losses.

43.     In June 2015, Bruton sent investors an email stating that the unrealized losses "are carried at the fund level."

**C.     The HDB Operative Documents**

44.     The terms of Investor A's investment in HDB are governed by an operating agreement.

45.     The HDB operating agreement specifies that Hope shall be entitled

to 20% of the "Net Capital Appreciation" of the fund.

46.     Net Capital Appreciation is defined as being an increase in the NAV of the fund over the course of an accounting period (typically one year).

47.     The NAV of a fund includes both realized and unrealized losses and gains.

48.     In other words, according to the operative document, unlike with the HI fund, Hope was never entitled to calculate its fee based on the "realized" profits in the HDB Fund.

49.     Nevertheless, that is the way that Hope charged fees.

50.      The operating agreement contains a provision similar in effect to the high water mark provision in the HI PPM.

51.     According to that provision, each investor is given a "Loss Recovery Account" and any decreases in NAV during an accounting period are added to the account. Subsequent increases in NAV are deducted from the account, and no incentive fee may be paid until the Loss Recovery Account has a zero balance.

52.     Investor A understood that Hope was taking a 20% share of monthly profits, but he did not understand the mechanics of how it was

calculated.

53.     Investor A believed that the HDB Fund was charged a fee in accordance with the operating agreement, and he signed a letter to that effect in September of 2015 in response to concerns raised during the Commission's examination of Hope.

**D.     Background of the Funds' Trading**

54.     By 2014, the Funds were trading heavily in options on S&P 500 Index Futures.  Those futures are referred to as E-Minis.

55.     A put is the option to sell the underlying future at a particular price (referred to as the "strike price") and a call is the option to purchase the underlying future at a particular price.

56.     For most of the options on the E-Minis that Hope traded, the options could not be exercised prior to maturity of the option and no additional consideration was required to exercise the option.  Instead, the options were exercised automatically if the option was "in the money" at maturity.  As a result, the option would "assign" and the account of the person who bought or sold the option would be treated as being long or short in the underlying future.

57.     If the Funds bought or sold an option that matured "out of the

money," the option would simply expire and there would be no assignment of the underlying future.

### E. The Fraudulent Trading Scheme

58. In October and December 2014, the Funds experienced significant trading losses due to volatility in the financial markets.

59. In response to these enormous losses, beginning in November 2014 and continuing almost every month to the present, Defendants entered a series of trades ("Scheme Trades") in the accounts of the HI Fund and the HDB Fund that had the purpose and effect of avoiding realization of the losses.

60. Hope had used similar Scheme Trades in the prior months.

61. Before February 2015, the Defendants used a variety of forms of Scheme Trades, but they all had the same purpose and effect, *i.e.*, to avoid having realized losses at any month's end.

62. In most months after February 2015, the Scheme Trades took the form of large matching "paired" trades that essentially canceled each other and cumulatively had little to no prospect of gain or loss, except for transaction costs.

63. These Scheme Trades, however, effectively "rolled over"

realization of losses to subsequent months, which allowed Defendants to (1) report a targeted monthly realized gain of approximately 1% in the Funds every month and (2) receive an incentive fee every month and avoid the high water mark restriction.

64.     Hope employees maintained a spreadsheet that tracked, month to date, the realized losses of the Funds.

65.     As the end of a particular month approached, Bruton would ask Hope employees for the amount of the Funds' net realized losses month to date.

66.     Bruton would then either enter a Scheme Trade herself or approve Scheme Trades that the other traders proposed and entered.

67.     These Scheme Trades often involved (1) selling call or put options on futures that would expire at the end of the current month ("first leg option") and simultaneously (2) buying call or put options on futures for the same quantity at the same "strike price" that would expire early the next month ("second leg option").

68.     These options would typically be deep "in the money," meaning they were very likely to be exercised or assigned.

69.     The sale of the first leg options would result in significant proceeds

(referred to as "premium") being paid to the respective Fund, which was realized as a gain for the current month when the first leg option expired.

70.     Bruton picked the size of the first leg option sale so that the premium collected would be sufficient to offset the losses realized for the month and enable the fund to report a net realized gain for the current month.

71.     The expiration of the first leg options also resulted in the assignment of futures in the Fund's account, which would carry a large "unrealized" loss at the current market price.

72.     The expiration of the second leg option, typically at the end of the first week of the subsequent month, covered this open futures position, but also required the Fund to realize a large loss (the purchase price of the second leg option).

73.     The net effect of the Scheme Trades was to allow Hope to defer indefinitely the Funds' realization of trading losses while consistently reporting a realized gain in the Funds and collecting an incentive fee.

74.     To illustrate with a specific example, the HI Fund began the month of February 2015 with a net unrealized loss of $44 million.  Much of this loss became realized early in the month.

75.     On February 24, 2015, Hope caused the HI Fund to *sell* 7,000 call

options (i.e., first leg options) on S&P 500 E-mini futures with a strike price of

$2,000, for a sales price of $39,228,812.50.  These first leg options expired on

Friday, February 27 (*i.e.*, 3 days later).

76.     That same day, Hope caused the HI Fund to *buy* 7,000 call options

(i.e., second leg options) on S&P 500 E-mini futures with the same strike price

as the first leg options.   The total purchase price was $39,556,075.  These

second-leg options expired on Friday, March 6 (*i.e.*, 10 days later).

77.     On February 24, 2015, the closing market price for the underlying

futures was $2,113.75, meaning that the first and second leg options were deep

in the money.

78.     Because the first and second leg options were deep in the money

on February 24, and because the options expired in such a short period of time,

the HI Fund had almost no exposure to market movements in the futures

underlying the options.  In other words, the HI Fund stood almost no chance of

making or losing money on this paired Scheme Trade regardless of which

direction the futures market moved.

79.     On February 27, the first leg options that Hope had sold expired,

and Hope realized a gain from the sale of those options in the amount of $39,228,812.50 (*i.e.* the sales price of those options).

80.      Because those options expired in the money, the underlying futures were assigned, such that the HI Fund's account was treated as being "short" 7,000 S&P 500 E-mini futures as of that day.   Hope did not record any realized loss from that assignment, however, even though, as a result of the assignment, Hope had essentially sold short the futures at a price below the current market price and would eventually need to cover the position in some manner.  Instead, the open futures position was treated as an *un*realized loss.

81.      In account statements sent to investors at the end of February, 2015, Hope reported that the HI Fund had net realized gains of $1,729,670 for the month.

82.      Hope charged the HI Fund a fee of $345,934 (*i.e.*, 20% of the reported realized gain), half of which was sent to the Hope Foundation.

83.      On March 6th, the second leg options expired in the money, the options were exercised, and the Fund was "delivered" 7,000 futures.

84.      The futures delivered as a result of the expiration of the second leg options covered the HI Fund's short futures position that had resulted from the

expiration of the first leg options.  Because the positions in the underlying futures cancelled each other out, the HI Fund did not realize any gain or loss on those futures.

85.    At that point, consistent with the fund's accounting policies, the HI Fund realized a loss of $39,556,075, *i.e.*, the purchase price of the second leg options.

86.    Hope then entered into similar Scheme Trades in March to avoid having realized losses at the end of that month, and so on.

87.    The Scheme Trades were not in the best interest of the Funds.

88.    The HI Fund has not had a month with a net realized loss since August 2011, just after it was opened.

89.    Between November 2014 and March 2016, Hope collected over $6 million in incentive fees from the HI Fund.

90.    Most of the incentive fees would not have been paid in the absence of the Scheme Trades.

91.    Of the 10% incentive fee paid to Hope by the HI Fund, Bruton divided the fee nearly equally among herself and two other Hope employees, after paying salaries of other employees and expenses for Hope.

92.     During this period, Hope also charged fees to HDB to which it was not entitled under the terms of the HDB operating agreement.

93.     At all times from as least October 2014 until June of 2015, HDB carried significant unrealized losses, which should have been factored into Hope's fee calculation.

94.     If those unrealized losses had been factored in, as required by the operating agreement, Hope would have been entitled to no fees.

95.     Instead, Hope collected over $1 million worth of fees during that period.

96.     Bruton paid herself a significant portion of the fee income.

97.     For example, in October of 2014, Hope experienced massive trading losses as a result of volatility in the market.  The HI Fund and the HDB Fund collectively ended the month with unrealized losses of approximately $100 million, most of which resulted from the October trading losses. Nevertheless, Hope reported to investors that the Funds had millions of dollars' worth of "realized" gains in October and collected incentive fees of more than $600,000.

98.     Despite the massive trading losses in both Funds that month,

Bruton caused Hope to pay her over $220,000 in early November 2014 for her October "performance."

99.     The Defendants never told the Funds' investors about the Scheme Trades.

100.    The Defendants never told the Funds' investors that Hope was causing the Funds to make trades for the primary purpose of avoiding realization of losses.

101.    The Defendants never told the Funds' investors that Hope was able to (and in fact did) pick the amount of its "realized" gain every month through Scheme Trades.

102.    Although the PPM described the high-water-mark structure, which appeared to protect investors from the cost of fees until losses in the Funds were made up, the Defendants never told the Funds' investors that Hope neutralized the protections of the high-water-mark fee structure by repeatedly engaging in the Scheme Trades.

103.    The Defendants never told the Funds' investors that Hope was able to avoid realizing losses indefinitely through the Scheme Trades.

104.    The Defendants never told the HI Fund's investors that the HI

Fund is likely to carry unrealized losses for the foreseeable future as a result of the Scheme Trades.

### F.    Hope's Redemption Practices

105.    Hope redeems investors exiting the HI Fund without reducing the value of their investments by the HI Fund's large net unrealized losses.

106.    Consequently, redeeming investors get a windfall, while the pro rata share of the unrealized losses to the remaining investors increases.

107.    While the Fund states that investors will redeem exclusive of unrealized losses, the Fund does not inform new investors that the value of their investments are subject to immediate reduction as a result of their being saddled with a pro rata share of large unrealized losses.

108.    The manner by which the HI Fund pays redemptions (excluding unrealized losses) creates a risk that, if the unrealized losses continue or there is a significant exodus, the last investors to redeem will not get any money.   That risk is not expressly disclosed to investors.

<u>**COUNT I**</u>
**(Hope and Bruton)**
**Violations of Section 17(a)(1) of the Securities Act**
**[15 U.S.C. § 77q(a)]**

109.     The Commission realleges paragraphs 1 through 108 above.

110.     Defendants Hope and Bruton, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

111.     Defendants Hope and Bruton knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

112.     While engaging in the course of conduct described above, Defendants Hope and Bruton acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

113.     By reason of the foregoing, Defendants Hope and Bruton indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## **COUNT II**

**(Hope and Bruton)**
**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

114.     Paragraphs 1 through 108 are hereby realleged and are incorporated by reference.

115.     Defendants Hope and Bruton, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.     obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.     engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

116.     By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections

17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III
### (Hope and Bruton)
### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]

117.  The Commission realleges paragraphs 1 through 108 above.

118.  Defendants Hope and Bruton, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.  employed devices, schemes, and artifices to defraud;

      b.  made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.  engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

      all as more particularly described above.

119.  Defendants Hope and Bruton knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material

-27-

facts, and engaged in fraudulent acts, practices and courses of business.  In

engaging in such conduct, the defendants acted with scienter, that is, with an intent

to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

120.    By reason of the foregoing, Defendants Hope and Bruton, directly

and indirectly, have violated and, unless enjoined, will continue to violate Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

## COUNT IV
### (Hope and Bruton)
### Violations of Sections 206(1) of the Advisers Act
### [15 U.S.C. §§ 80b-6(1)]

121.    The Commission realleges paragraphs 1 through 108 above.

122.    From at least 20011 through the present, Defendants Hope and

Bruton, acting as investment advisers, using the mails and the means and

instrumentalities of interstate commerce, directly and indirectly, employed

devices, schemes and artifices to defraud one or more advisory clients and/or

prospective clients.

123.    Defendants Hope and Bruton knowingly, intentionally, and/or

recklessly engaged in the aforementioned devices, schemes and artifices to

defraud.  In engaging in such conduct, Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

124.    By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated, and, unless enjoined, Defendants will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

### COUNT V
### (Hope and Bruton)
### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]

125.    Paragraphs 1 through 108 are hereby realleged and are incorporated herein by reference.

126.    From at least 2011 through the present, Defendants Hope and Bruton, acting as investment advisers, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit on one or more advisory clients and/or prospective clients.

127.    By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated and, unless enjoined, will continue to violate Section

206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT VI
### (Hope and Bruton)
### Violations of Section 206(4) and Rule 206(4)-8 of the Advisers Act
### [15 U.S.C. § 80b-6(4) & 17 C.F.R. §206(4)-8]

128.    The Commission realleges paragraphs 1 through 108 above.

129.    From at least 2011 through the present,  Defendants Hope and

Bruton, in connection with the purchase and sale of pooled investment vehicles

described herein:

a.    made untrue statements of material facts and/or omitted to state

material facts necessary to make the statements made, in the light of the

circumstances under which they were made, not misleading, and

b.    engaged in acts, practices, and courses of business that were

fraudulent, deceptive, and/or manipulative, all as more particularly described

above.

130.    Defendants Hope and Bruton knowingly, intentionally, and/or

recklessly made untrue statements of material facts and omitted to state material

facts, and engaged in fraudulent acts, practices and courses of business.  In

engaging in such conduct, Defendants acted with scienter, that is, with an intent

to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

131. By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## COUNT VII
### (Bruton)
### Aiding and Abetting

132. The Commission realleges paragraphs 1 through 108 above.

133. Bruton substantially assisted the violations set forth in Counts I through VI above, by, among other things, planning, facilitating and/or directing the Scheme Trades.

134. Bruton knew the true purpose of the Scheme Trades and knew that the Scheme Trades had not been disclosed to investors.

135. Bruton personally benefitted from the fees generated by the Scheme Trades.

136. As a result of the conduct described above, Bruton aided and abetted the violations set forth in Counts I through VI above.

## COUNT VIII
## (Hope Foundation)

137.    The Commission realleges paragraphs 1 through 108 above.

138.    As a result of the conduct described above, the Hope Foundation received proceeds of the Defendants' fraudulent scheme.

139.    The Hope Foundation had no legitimate claim to the funds it received as a result of the scheme and was unjustly enriched by the receipt of such proceeds.

## PRAYER FOR RELIEF

The Commission respectfully requests that this Court:

1.    Find that Defendants committed the violations alleged;

2.    Enter injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, preliminarily and permanently restraining and enjoining Defendant from violating, directly or indirectly, or aiding and abetting violations of the law and rules alleged in this complaint;

3.    Order Defendants and the Relief Defendant to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus prejudgment interest;

4.      Order Defendants to pay civil penalties, pursuant to Section 20(d)

of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §

80b-9(e)] in an amount to be determined by the Court; and

5.      Order such other relief as is necessary and appropriate.

**JURY TRIAL DEMAND**

The Commission hereby demands a jury trial as to all issues so triable.

This 31st day of May, 2016.

/s/ Walter Jospin
Walter Jospin
Regional Director
Georgia Bar No. 405450
jospinw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Robert Gordon
Senior Trial Attorney
Georgia Bar No.
gordonr@sec.gov

s/ Joshua A. Mayes
Joshua A. Mayes
Senior Trial Attorney

Georgia Bar No. 143107
mayesj@sec.gov

United States Securities & Exchange Commission
950 E. Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
404-842-7600