## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                **Plaintiff,**

        **v.**

HOPE ADVISORS, LLC, KAREN
BRUTON, TODD WORTMAN, and
DAWN ROBERTS,

                **Defendants,**

and

JUST HOPE FOUNDATION,

                **Relief  Defendant.**

Civil Action File No.
1:16-cv-1752-LMM

## SECOND AMENDED COMPLAINT

    Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This enforcement action arises out of a fraudulent scheme to generate fees by Hope Advisors, LLC ("Hope"),  a registered investment adviser, its principal, Karen Bruton, and two Hope employees, Dawn Roberts and Todd Wortman (collectively, "Defendants").  Hope managed the account of two private investment funds, Hope Investments, LLC (the "HI Fund") and HDB Investments, LLC ("HDB Fund") (collectively, the "Funds").  Hope's only compensation for managing the funds came in the form of an incentive fee, calculated as a share (10% for the HI Fund and 20% for HDB Fund) of the profits earned in the Funds' accounts).

2.      The HI Fund and HDB Fund employed a "high-water-mark" fee structure pursuant to which Hope was entitled to no fees unless the Funds made profits that exceeded past losses.  In other words, all prior losses needed to be made up before Hope would be paid.  From no later than January 2013 through May 31, 2016 (the "relevant period"), when the Commission filed its initial Complaint, Defendants engaged in a continuous pattern of fraudulent trading to circumvent the impact of the high-water-mark fee structure.  The fraudulent trading exploited the HI Fund's practice of calculating the incentive fee

exclusively on the basis of monthly "realized" gains and losses—"unrealized" gains and losses (*i.e.*, those attributable to open trading positions at a month's end) were not included in the fee calculation.[1]

     3.    Each month, Hope caused the Funds to make certain "Scheme Trades" that had the purpose and effect of realizing a large gain in the current month while effectively guaranteeing a large loss would be realized early the following month.   In essence, these trades continuously converted any realized losses into realized gains in the current month, and losses which would be realized in subsequent months, except that they would be continually deferred by the Defendants engaging in additional Scheme Trades.  The Defendants did not simply avoid realization of trading losses, however, they also intentionally sized the Scheme Trades such that the Funds realized a profit every month.  Hope employees maintained a spreadsheet that tracked, month to date, the realized losses of the Funds.  As the end of each month approached, Bruton picked the amount of profit she wished the Funds to show (and de facto, the fees she wished

---

[1] As alleged below, the HDB Fund's operative documents actually called for the incentive fee to be calculated in a different manner.  Nevertheless, in practice, Hope calculated the fee for the HDB Fund in the same way it calculated the fee for the HI Fund.

to generate), and she, along with Wortman and Roberts, would work together to size the Scheme Trades accordingly.

4.      Without the fraudulent Scheme Trades, Hope would have received almost no incentive fees during the relevant period.  Instead, Hope extracted millions of dollars in incentive fees.  Up until the filing of the initial Complaint in this action, Hope used the Scheme Trades to avoid realization of more than $50 million in losses in the HI Fund, while still earning large monthly incentive fees.

5.      In addition to the incentive fee paid to Hope by the HI Fund, the fund paid a 10% incentive fee to the Just Hope Foundation (the "Hope Foundation"), which in turn funded Just Hope International (the "Hope Charity"), a charity founded and run by Bruton.  The Hope Foundation and its employees (aside from Bruton) were not involved in the fraudulent trading scheme, however, it did not provide any goods or services to the HI Fund in exchange for the incentive fees the Hope Foundation was paid.  Accordingly, the Hope Foundation was unjustly enriched and is a Relief Defendant in this action.

## **DEFENDANTS**

6.      **Hope Advisors, LLC ("Hope")** is a Tennessee limited liability company formed on March 23, 2011, and serves as a commodity pool operator and trading manager.  Hope is wholly owned by Bruton, and was the investment adviser to the HI and HDB Funds.  Hope has been a Commission-registered investment advisor since July 2013.  Hope is registered with the Commodities Futures Trading Commission as a commodity pool operator and became a member of the National Futures Association in such capacity in January 2013.  On April 15, 2015 the CFTC entered an order against Hope finding violations of Section 4m(1) of the Commodity Exchange Act (requiring commodity pool operators to register) and Regulation 4.22(d) thereunder (requiring commodity pool operators to disclose to pool participants both realized and unrealized gains and losses).

7.      **Karen Bruton** is the owner of Hope Advisors, LLC.  Bruton is 66 years of age and is a self-taught options trader.  Formerly, she worked as a corporate executive.  She has an inactive CPA license.  While Hope employs three traders in addition to Bruton, Bruton approves all trades, including the trades that are at issue in this matter.

8.    **Dawn Roberts** is the controller and chief compliance officer of, and a trader for, Hope and resides in the Nashville, Tennessee area.  Roberts is an associated person of Hope.  Roberts was tasked with calculating the amount of gain needed for the HI Funds to report a net realized gain to investors at the end of each month.  Roberts received a portion of the incentive fees collected by Hope.

9.    **Todd Wortman** is a senior trader employed by Hope and resides in the Nashville, Tennessee area.  Wortman is an associated person of Hope. He has an inactive CPA license from Tennessee.  In conjunction with Bruton, Wortman was primarily responsible for identifying potentially profitable trades for the HI Fund.  Wortman received a portion of the incentive fees collected by Hope.

## RELIEF DEFENDANT

10.    **Just Hope Foundation (the "Hope Foundation")** is a tax-exempt Section 501(c)(3) private foundation formed in Tennessee in 2011.  Bruton is its President.  Hope Foundation is a private grant making entity that supports the Hope Charity, a charity founded by Bruton.  Hope Foundation receives 50% of the incentive fees earned by Hope from the HI Fund.  As of year-end

2014, the Hope Foundation had assets of almost $10 million, most of which is invested in the HI Fund.

## OTHER RELEVANT ENTITIES

11.    **Hope Investments, LLC (the "HI Fund")** is a privately offered, single manager fund offered by Hope to accredited investors as that term is defined under Section 4(a)(2) of the Securities Act of 1933 ("Securities Act") and Rule 506 of Regulation D promulgated thereunder.  The HI Fund is a Tennessee limited liability company that was formed on February 16, 2011. The HI Fund is not registered as an investment company under the Investment Company Act of 1940 in reliance on Section 3(c)(1) thereunder, since it will not admit more than 100 beneficial owners.  As of February 29, 2016, the net asset value ("NAV") of the HI Fund was $136 million.

12.    **HDB Investments, LLC (the "HDB Fund")** is a Tennessee limited liability company formed in April 2008.  As of approximately 2013 the Fund was a single investor investment vehicle.  In approximately March 2016, the HDB Fund's sole investor placed the HDB Fund's entire net asset value, approximately $65 million, into the HI Fund.  The HDB Fund is no longer operating.

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to the authority

conferred upon it by Sections 20(b) and 20(d) of the Securities Act, [15 U.S.C.

§§ 77t(b) and 77t(d)], Section 21(d) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78u(d)], and Sections 209(d) and 209(e) of the

Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(b) and

80b-9(d)].

14.     This Court has jurisdiction over this action pursuant to Section

22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27(a) of the Exchange

Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. §

80b-14(a)].

15.     In connection with the transactions, acts, practices, and courses of

business described in this Complaint, the Defendants, directly and indirectly,

have made use of the means or instrumentalities of interstate commerce, of the

mails, and/or of the means and instruments of transportation or communication

in interstate commerce.

16.     The Defendants have consented to venue in the Atlanta Division

of the Northern District of Georgia.

## FACTS

### A. Background

17.     Karen Bruton, a CPA, spent more than 25 years as a vice president and corporate controller, most recently with a Nashville, Tennessee-based private corporation that produced limestone. Sometime prior to her retirement in 2007, Bruton began to take online and other training courses in options trading.

18.     In 2008, Bruton organized the HDB Fund as an investment vehicle to trade options for herself and approximately five other investors.

19.      The largest and primary investor in HDB Fund was a wealthy individual ("Investor A"). Ultimately, Investor A became the sole investor in HDB Fund.

20.     In 2011, Bruton organized the HI Fund to expand her ability to invest the funds of family and friends.

21.     Bruton also founded Hope to provide advisory services to the HI Fund and HDB Fund.

22.      Bruton's and Hope's trading in the two funds was very similar and primarily consisted of trading in (1) options, (2) options on futures, and (3)

futures, tied to broad-based market indices such as the S&P 500, Russell 2000 and NASDAQ 100.

23.     The general trading strategy for both Funds was to sell options with the goal of having them expire "out of the money," allowing the Funds to profit from the proceeds it received from selling the options. The HI Fund's offering documents state that it trades 50-60 days out and within two standard deviations of the market that the options are based upon.

24.     The HI Fund had an NAV of approximately $136 million as of February 29, 2016.

25.     As of the same date, the HI Fund had unrealized losses of approximately $57 million.

26.     The HI Fund had unrealized losses at the end of nearly every month for at least two years before the filing of the original complaint in this action, with the amount fluctuating between $3 million and $62 million.

27.     The minimum investment in the HI Fund is $250,000.  The investment is termed the investor's "capital account."

28.     According to the HI Fund documents, including its private placement memorandum, only realized gains and losses would affect the capital

account and only realized gains and losses would affect the amount of any investor's redemption from the HI Fund.

29.     Until approximately August 2013, Hope only reported this realized capital position to investors.  At that time, Hope was notified of certain investor reporting and other deficiencies resulting from an audit by the National Futures Association.  Hope then began to also provide each investor a statement of his or her share of the Funds' net asset value (which includes unrealized gains and losses).

30.     Unlike the fee structure used by many investment advisers, Hope does not charge the Funds a management fee based on a percentage of assets under management.

31.     Instead, Hope shares in any net realized gains earned in either Fund in a given month by deducting an incentive fee equal to 20% of net realized gains during the month.

32.     Half of the incentive fee for the HI Fund (*i.e.*, 10% of net realized gains) goes to the Hope Foundation.

33.     The operative documents of the Funds provided that if the Funds suffered losses, Hope would receive no fee and would receive no fees in

subsequent months until the losses have been offset by gains (the so-called
"high water mark" restriction).

34.   Hope excluded unrealized gains and losses for purposes of
calculating the incentive fee.

35.   Hope charged the HI Fund incentive fees in every month from
2013 until shortly before the Commission filed the original Complaint in this
action.

36.   In the summer of 2015, Hope caused the HDB Fund to realize its
losses.  This resulted in more than a $30 million decrease in the "capital
account" of Investor A.  Hope ceased collecting an incentive fee at that time,
and in the spring of 2016, Investor A redeemed his interest in the HDB Fund
and used that money to buy an additional interest in the HI Fund.

**B.    The HI Fund's Private Placement Memorandum**

37.   Potential investors in the HI Fund were provided a private
placement memorandum ("PPM").

38.   The PPM used during the relevant period disclosed that the fund
would pay an Incentive Fee based on 20% of *realized* profits (with 10% going
to Hope and the other 10% going to the Hope Foundation).

39.     The PPM also noted the high-water-mark structure of the fee agreement, stating, in part, as follows:

> For the avoidance of doubt, any loss by the Fund in any month is made up "dollar for dollar" to the investors before the Incentive Allocation is paid again on New Trading Profits made on the Fund's trades.

40.     The PPM disclosed that the fee structure gave Hope an incentive to defer realization of losses, however it immediately minimized the risk that losses could be deferred for any substantial period of time.

41.     Specifically, the PPM stated as follows:

> **Incentive allocations may be paid by the Fund Even Though the Fund Is Experiencing Unrealized Trading Losses.** . . . [I]t is possible that the Fund will pay an Incentive Allocation on New Trading Profits even though there are unrealized losses on open positions. Thus, there is an incentive for the Investment Adviser to realize gains and defer realization of losses; however due to the type of trading in which the Investment Advisor engages, it is unlikely that the Investment Advisor will be able to defer realization of losses on positions for any extended period of time since most trades into which the Investment Advisor enters will only be open for 30 to 90 days at maximum.

42.     When an investor would withdraw from the fund during the relevant period, unrealized gains or losses would be excluded. This was disclosed in the PPM, which provided as follows:

> A Withdrawing Member receives only his or her pro rata portion of Net Realized Profits or Losses at the Withdrawal Date and will not Participate in Unrealized Gains or Losses.
>
> . . .
>
> Following such a withdrawal by a member, all other Members remaining in the fund after the withdrawal date will receive the benefit of any gains realized subsequent to the Withdrawal date; however the Members remaining in the Fund will also participate in any losses subsequently realized on positions that were outstanding as of that Withdrawal Date and closed after the Withdrawal Date.

43.    At the end of each month during the relevant period, Hope sent account statements to each investor in the HI fund.

44.    The first page of that account statement showed realized gains for the month and year to date, the monthly and year to date incentive fee paid on those realized gains, and the change in the realized gains and loss, both for the month and year to date.  As of 2013, a small box on the second page also showed the NAV of the investor's account and his or her share of the unrealized losses.

45.    In June 2015, Bruton sent investors an email stating that the unrealized losses "are carried at the fund level."

C.      **The HDB Fund's Operative Documents**

46.     The terms of Investor A's investment in the HDB Fund were governed by an operating agreement.

47.     The HDB Fund operating agreement specified that Hope shall be entitled to 20% of the "Net Capital Appreciation" of the fund.

48.     Net Capital Appreciation was defined as being an increase in the NAV of the fund over the course of an accounting period (typically one year).

49.     The NAV of a fund includes both realized and unrealized losses and gains.

50.     In other words, according to the operative document, unlike with the HI Fund, Hope was never entitled to calculate its fee based on the "realized" profits in the HDB Fund.

51.     Nevertheless, that is the way that Hope charged fees.

52.     The operating agreement contained a provision similar in effect to the high water mark provision in the HI Fund's PPM.

53.     According to that provision, each investor was to be given a "Loss Recovery Account" and any decreases in NAV during an accounting period

were to be added to the account.  Subsequent increases in NAV were to be

deducted from the account, and no incentive fee was to be paid until the Loss

Recovery Account had a zero balance.

54.     Investor A understood that Hope was taking a 20% share of

monthly profits, but he did not understand the mechanics of how it was

calculated.

55.     Investor A believed that the HDB Fund was charged a fee in

accordance with the operating agreement, and he signed a letter to that effect in

September of 2015 in response to concerns raised during the Commission's

examination of Hope.

**D.     Background of the Funds' Trading**

56.     By 2014, the Funds were trading heavily in options on S&P 500

Index Futures.  Those futures are referred to as E-Minis.

57.     A put is the option to sell the underlying future at a particular price

(referred to as the "strike price") and a call is the option to purchase the

underlying future at a particular price.

58.     For most of the options on the E-Minis that Hope traded, the

options could not be exercised prior to maturity of the option and no additional

consideration was required to exercise the option.  Instead, the options were exercised automatically if the option was "in the money" at maturity.  As a result, the option would "assign" and the account of the person who bought or sold the option would be treated as being long or short in the underlying future.

59.    If the Funds bought or sold an option that matured "out of the money," the option would simply expire and there would be no assignment of the underlying future.

**E.    The Fraudulent Trading Scheme**

60.    In October and December 2014, the Funds experienced significant trading losses due to volatility in the financial markets.

61.    In response to these extensive losses, beginning in November 2014 and continuing almost every month until the filing of the Complaint in this action, Defendants entered a series of trades ("Scheme Trades") in the accounts of the HI Fund and the HDB Fund that had the purpose and effect of avoiding realization of the losses.

62.    Hope had used similar Scheme Trades in prior months.

63.    Before February 2015, the Defendants used a variety of forms of Scheme Trades, but they all had the same purpose and effect, *i.e.*, to avoid

having realized losses at any month's end.

64.    In most months after February 2015, the Scheme Trades took the form of large matching "paired" trades that essentially canceled each other and cumulatively had little to no prospect of gain or loss, except for transaction costs.

65.    These Scheme Trades, however, effectively "rolled over" realization of losses to subsequent months, which allowed Defendants to (1) report a targeted monthly realized gain of approximately 1% in the Funds every month and (2) receive an incentive fee every month and avoid the high water mark restriction.

66.    Hope employees, including Roberts, maintained a spreadsheet that tracked, month to date, the realized losses of the Funds.

67.    As the end of a particular month approached, Bruton would ask Hope employees for the amount of the Funds' net realized losses month to date.

68.    Bruton would then either enter a Scheme Trade herself or approve Scheme Trades that the other traders proposed and entered.

69.    These Scheme Trades often involved (1) selling call or put options on futures that would expire at the end of the current month ("first leg option")

and simultaneously (2) buying call or put options on futures for the same quantity at the same "strike price" that would expire early the next month ("second leg option").

70.     These options would typically be deep "in the money," meaning they were very likely to be exercised or assigned.

71.     The sale of the first leg options would result in significant proceeds (referred to as "premium") being paid to the respective Fund, which was realized as a gain for the current month when the first leg option expired.

72.     Bruton picked the size of the first leg option sale so that the premium collected would be sufficient to offset the losses realized for the month and enable the fund to report a net realized gain for the current month.

73.     The expiration of the first leg options also resulted in the assignment of futures in the Fund's account, which would carry a large "unrealized" loss at the current market price.

74.     The expiration of the second leg option, typically at the end of the first week of the subsequent month, covered this open futures position, but also required the Fund to realize a large loss (the purchase price of the second leg option).

75.     The net effect of the Scheme Trades was to allow Hope to defer indefinitely the Funds' realization of trading losses while consistently reporting a realized gain in the Funds and collecting an incentive fee.

76.     To illustrate with a specific example, the HI Fund began the month of February 2015 with a net unrealized loss of $44 million.  Much of this loss became realized early in the month.

77.     On February 24, 2015, Hope caused the HI Fund to *sell* 7,000 call options (*i.e.*, first leg options) on S&P 500 E-mini futures with a strike price of $2,000, for a sales price of $39,228,812.50.  These first leg options expired on Friday, February 27 (*i.e.*, 3 days later).

78.     That same day, Hope caused the HI Fund to *buy* 7,000 call options (*i.e.*, second leg options) on S&P 500 E-mini futures with the same strike price as the first leg options.  The total purchase price was $39,556,075.  These second-leg options expired on Friday, March 6 (*i.e.*, 10 days later).

79.     On February 24, 2015, the closing market price for the underlying futures was $2,113.75, meaning that the first and second leg options were deep in the money.

80.    Because the first and second leg options were deep in the money on February 24, and because the options expired in such a short period of time, the HI Fund had almost no exposure to market movements in the futures underlying the options.  In other words, the HI Fund stood almost no chance of making or losing money on this paired Scheme Trade regardless of which direction the futures market moved.

81.    On February 27, the first leg options that Hope had sold expired, and Hope realized a gain from the sale of those options in the amount of $39,228,812.50 (*i.e.,* the sales price of those options).

82.    Because those options expired in the money, the underlying futures were assigned, such that the HI Fund's account was treated as being "short" 7,000 S&P 500 E-mini futures as of that day.  Hope did not record any realized loss from that assignment, however, even though, as a result of the assignment, Hope had essentially sold short the futures at a price below the current market price and would eventually need to cover the position in some manner.  Instead, the open futures position was treated as an *un*realized loss.

83.    The amount of the "realized" gain from the transaction was not, however, reflective of the profitability of the options trade because the open

futures position resulted directly from the sale of the options.  In other words, Hope treated the options trade as "closed" even though there was still ongoing exposure from the trade because of the futures position.

84.     In account statements sent to investors at the end of February, 2015, Hope reported that the HI Fund had net realized gains of $1,729,670 for the month.

85.     Hope charged the HI Fund a fee of $345,934 (*i.e.*, 20% of the reported realized gain), half of which was sent to the Hope Foundation.

86.     On March 6th, the second leg options expired in the money, the options were exercised, and the Fund was "delivered" 7,000 futures.

87.     The futures delivered as a result of the expiration of the second leg options covered the HI Fund's short futures position that had resulted from the expiration of the first leg options.  Because the positions in the underlying futures cancelled each other out, the HI Fund did not realize any gain or loss on those futures.

88.     At that point, consistent with the fund's accounting practice, the HI Fund realized a loss of $39,556,075, *i.e.*, the purchase price of the second leg options.

89.   Hope then entered into similar Scheme Trades in March to avoid having realized losses at the end of that month, and so on.

90.   The procedure for executing trades like the one set forth above would typically involve Bruton, Wortman and Roberts collaborating to determine the appropriate size and type of trade.

91.   Roberts would track in a spreadsheet up-to-date trading data for the HI Fund, which she would download from an online brokerage platform. Roberts' spreadsheet included a formula that would allow her to see, in real time, the realized losses or gains for the month based on the trade data.

92.   Roberts would track that metric, and as the end of a month approached, she would tell Bruton and Wortman the amount of realized losses for the month up to that point, which would include the losses realized early in the month from the prior month's Scheme Trade.  She would also tell Bruton and Wortman the current amount of the investor capital account balances, which would fluctuate month-to-month as a result of contributions and redemptions.

93.   Bruton and Wortman would then use the total capital account balances to determine how large the Scheme Trades needed to be to show an approximate 1% return on the aggregate capital account balance for the month.

94.   Once they received the data from Roberts, Wortman and Bruton would determine the amount of premium they wanted to sell in the first-leg option transaction or a similar transaction.  At that point, Wortman typically would review the options markets to identify the most advantageous way to raise the desired amount of premiums.  For instance, he would attempt to identify options for which there was sufficient availability in the market and for which he could minimize the cost to the HI Fund of the Scheme Trade

**F.   Hope's Controller Objected to the Scheme Trades in Early 2015**

95.   In early spring 2015, Hope's then-controller ("the Controller") objected to the continuing practice of executing the Scheme Trades.  The Controller raised these concerns with both Bruton and with Roberts, suggesting that, at a minimum, the Scheme Trades should be sized so as not to realize profits that allowed Hope to skirt the high-water-mark provision.

96.   The Controller documented his concerns in a memorandum to Roberts, which Roberts provided to Bruton.

97.   That memorandum stated, in part as follows:

The practice of selling ITM calls/puts at EOM (and buying the same positions in the next month) in order to realize the gain from the sale and defer losses to future months allows for the possibility for management to choose the amount of realized return for the month. Instead of simply making trades according to strategy and opportunity and reporting the results, any amount of premium can be sold at EOM in the month-end play to show any amount of monthly realized gain.
. . .
Had the losses been realized in the month they were incurred (not deferred to future months), the High Water Mark provision would be activated and no performance fee would be charged until the losses were recovered.
. . .
I believe the monthly, realized-only basis member statements (which are based on the operating agreement and are sent with the GAAP statements) are misleading. They show a % ROR that does not account for capital drawdown resulting from deferred losses. They also show an overstated account balance when compared to the fair market value of the account (NAV) because they do not account for the significant liabilities tied to open positions resulting from the month-end "debt roll forward". As such, they do not give the investors an accurate picture of the financial status of their accounts.

98.   Bruton refused to stop making Scheme Trades or to size them such that the HI Fund would stop earning a fee until the losses had been made up.

99.    As a justification, Bruton told the Controller that she was "running a business" and "had bills to pay," or words to that effect.

100.    When Bruton and Roberts failed to address his concerns, the Controller resigned.

101.    Wortman was aware of the concerns raised by the Controller and of the reason for the Controller's resignation.

102.    The Scheme Trades continued after the Controller's resignation.

**G.    Roberts and Wortman Participated in Hope's Fraud on the HI Fund**

103.    Roberts maintained and tracked the data that was essential to carrying out the Scheme Trades in the HI Fund.  She actively participated in the process of making Scheme Trades even after receiving the memorandum from the Controller.

104.    Roberts also was in charge of calculating the amount of the fee Hope would collect from the HI Fund each month, and was thus fully aware of the impact of the Scheme Trades.

105.   Roberts received a share of the fees collected from the HI Fund as her compensation.  In 2015, the amount of her share was approximately $650,000.

106.   As month's end approached, Wortman would consult with Roberts and Bruton to determine the amount of realized gains Wortman needed to target through a Scheme Trade.

107.   Wortman would then survey the options market to identify Scheme Trades and would propose specific Scheme Trades to Bruton.

108.   Once Bruton approved a Scheme Trade, Wortman would typically be the person to execute the trade.

109.   Wortman and Roberts knew the purpose and effect of the Scheme Trades.

110.   Like Roberts, Wortman received a share of the fees collected from the HI Fund as his compensation.  In 2015, his share was approximately $650,000.

111.   The Scheme Trades were not in the best interest of the Funds.

112.   The HI Fund did not have a month with a net realized loss from August 2011, just after it was opened, until the initial Complaint in this action was filed.

113.   Between November 2014 and March 2016, Hope collected over $6 million in incentive fees from the HI Fund.

114.   Most of the incentive fees would not have been paid in the absence of the Scheme Trades.

**H.     Bruton and Hope Defrauded the HDB Fund**

115.   During this period, Hope also charged fees to the HDB Fund to which it was not entitled under the terms of the HDB Fund's operating agreement.

116.   At all times from as least October 2014 until June of 2015, the HDB Fund carried significant unrealized losses, which should have been factored into Hope's fee calculation.

117.   If those unrealized losses had been factored in, as required by the operating agreement, Hope would have been entitled to no fees.

118.   Hope and Bruton also caused the HDB Fund to execute Scheme Trades in the accounts of the HDB Fund.

119.   Even if Hope had been entitled to collect fees on the basis of realized gains and losses, it would have been entitled to no fees from October 2014 until June of 2015 in the absence of the Scheme Trades.

120.   Instead, Hope collected over $1 million worth of fees during that period.

121.   Bruton paid herself a significant portion of the fee income.

122.   For example, in October of 2014, Hope experienced massive trading losses as a result of volatility in the market.  The HI Fund and the HDB Fund collectively ended the month with unrealized losses of approximately $100 million, most of which resulted from the October trading losses. Nevertheless, Hope reported to investors that the Funds had millions of dollars' worth of "realized" gains in October and collected incentive fees of more than $600,000.

123.   Despite the massive trading losses in both Funds that month, Bruton caused Hope to pay her over $220,000 in early November 2014 for her October "performance."

### I.     Bruton and Hope Misled the Funds' Investors

124.   Bruton and Hope never told the Funds' investors about the Scheme Trades.

125.   Bruton and Hope never told the Funds' investors that Hope was causing the Funds to make trades for the primary purpose of avoiding realization of losses.

126.   Bruton and Hope never told the Funds' investors that Hope was able to (and in fact did) pick the amount of its "realized" gain every month through Scheme Trades.

127.   Bruton and Hope never told the Funds' investors that the amount of "realized" gain each month bore no relation to the profitability of the Funds' trading.

128.   Bruton and Hope misled investors by telling them that Hope was "managing" unrealized losses by pushing "positions" into future months, when in fact, Hope was causing the Funds to enter into Scheme Trades that were unrelated to the trades that caused the losses.

129.   Bruton and Hope misled investors by comparing the "realized" gains to indices like the S&P 500 without informing them about the Scheme Trades.

130.   Bruton and Hope misled investors by touting "realized" gains when they bore no relation to the actual profitability of the purportedly "closed" options trades that were part of the Scheme Trades.

131.   Although the PPM described the high-water-mark structure, which appeared to protect investors from the cost of fees until losses in the Funds were made up, Bruton and Hope never told the Funds' investors that Hope neutralized the protections of the high-water-mark fee structure by repeatedly engaging in the Scheme Trades.

132.   Bruton and Hope never told the Funds' investors that Hope was able to avoid realizing losses indefinitely through the Scheme Trades.

133.   Bruton and Hope never told the HI Fund's investors that the HI Fund was likely to carry unrealized losses for the foreseeable future as a result of the Scheme Trades.

134.   At least three new investors purchased interests in the HI Fund in 2015 after the Defendants had begun making the Scheme Trades.

135.   Those three new investors invested more than $900,000 in the HI Fund in 2015.

136.   At least five existing investors increased the size of their investment in the HI Fund in 2015 after the Defendants had begun making the Scheme Trades.

137.   Those five existing investors made more than $1,600,000 in capital contributions to the HI Fund in 2015.

**J.**   **Hope's Redemption Practices**

138.   Hope redeems investors exiting the HI Fund without reducing the value of their investments by the HI Fund's large net unrealized losses.

139.   Consequently, redeeming investors get a windfall, while the pro rata share of the unrealized losses to the remaining investors increases.

140.   While the Fund states that investors will redeem exclusive of unrealized losses, the Fund did not inform new investors that the value of their investments were subject to immediate reduction as a result of their being saddled with a pro rata share of large unrealized losses.

-32-

## COUNT I
### (Hope and Bruton)
### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)]

141.   The Commission realleges paragraphs 1 through 140 above.

142.   Defendants Hope and Bruton, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

143.   Defendants Hope and Bruton knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

144.   While engaging in the course of conduct described above, Defendants Hope and Bruton acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

145.   By reason of the foregoing, Defendants Hope and Bruton indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II
### (Hope and Bruton)
### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

146.   Paragraphs 1 through 140 are hereby realleged and are incorporated by reference.

147.   Defendants Hope and Bruton, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.   engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

148.   By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated and, unless enjoined, will continue to violate

Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III
### (Hope and Bruton)
### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]

149.   The Commission realleges paragraphs 1 through 140 above.

150.   Defendants Hope and Bruton, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.   employed devices, schemes, and artifices to defraud;

      b.   made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.   engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

151.   Defendants Hope and Bruton knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, the defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

152.   By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT IV
**(Hope and Bruton)**
**Violations of Sections 206(1) of the Advisers Act**
**[15 U.S.C. §§ 80b-6(1)]**

153.   The Commission realleges paragraphs 1 through 140 above.

154.   During the relevant period, Defendants, acting as investment advisers, using the mails and the means and instrumentalities of interstate

commerce, directly and indirectly, employed devices, schemes and artifices to defraud one or more advisory clients and/or prospective clients.

155.   Defendants Hope and Bruton knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In engaging in such conduct, Defendants Hope and Bruton acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

156.   By reason of the foregoing, Defendants Hope and Bruton have violated, and, unless enjoined, will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

### COUNT V
### (Hope and Bruton)
### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]

157.   Paragraphs 1 through 140 are hereby realleged and are incorporated herein by reference.

158.   During the relevant period, Defendants Hope and Bruton, acting as investment advisers, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices,

and courses of business which would and did operate as a fraud and deceit on one or more advisory clients and/or prospective clients.

159.   By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

**COUNT VI**
**(Hope and Bruton)**
**Violations of Section 206(4) and Rule 206(4)-8 of the Advisers Act**
**[15 U.S.C. § 80b-6(4) & 17 C.F.R. §206(4)-8]**

160.   The Commission realleges paragraphs 1 through 140 above.

161.   During the relevant period,  Defendants Hope and Bruton, in connection with the purchase and sale of pooled investment vehicles described herein:

a.      made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, and

b.      engaged in acts, practices, and courses of business that were fraudulent, deceptive, and/or manipulative, all as more particularly described above.

162.   Defendants Hope and Bruton knowingly, intentionally, and/or recklessly made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants Hope and Bruton acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

163.   By reason of the foregoing, Defendants Hope and Bruton, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## COUNT VII
### (Bruton)
### Aiding and Abetting

164.   The Commission realleges paragraphs 1 through 140 above.

165.   Bruton substantially assisted the violations set forth in Counts I through VI above, by, among other things, planning, facilitating and/or directing the Scheme Trades.

166.   Bruton knew the true purpose of the Scheme Trades and knew that the Scheme Trades had not been disclosed to investors.

167.   Bruton personally benefitted from the fees generated by the Scheme Trades.

168.   As a result of the conduct described above, Bruton aided and abetted the violations set forth in Counts I through VI above.

### COUNT VIII
### (Roberts and Wortman)
### Aiding and Abetting

169.   The Commission realleges paragraphs 1 through 140 above.

170.   Roberts and Wortman substantially assisted the violations set forth in Counts IV through VI above, by, among other things, planning, facilitating and/or directing the Scheme Trades in the HI Fund.

180.   Roberts and Wortman knew the true purpose of the Scheme Trades and knew that the Scheme Trades were not in the best interest of the HI Fund.

181.   Roberts and Wortman personally benefitted from the fees generated by the Scheme Trades in the HI Fund.

182.   As a result of the conduct described above, Roberts and Wortman aided and abetted the violations set forth in Counts IV through VI above.

## COUNT IX
### (Hope Foundation)

183.   The Commission realleges paragraphs 1 through 140 above.

184.   As a result of the conduct described above, the Hope Foundation received proceeds of the Defendants' fraudulent scheme.

185.   The Hope Foundation had no legitimate claim to the funds it received as a result of the scheme and was unjustly enriched by the receipt of such proceeds.

## PRAYER FOR RELIEF

The Commission respectfully requests that this Court:

1.   Find that Defendants committed the violations alleged;

2.   Enter injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants from violating, directly or indirectly, or aiding and abetting violations of the law and rules alleged in this complaint;

3.   Order Defendants and the Relief Defendant to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus prejudgment interest;

4.      Order Defendants to pay civil penalties, pursuant to Section 20(d)

of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C.

§ 80b-9(e)] in an amount to be determined by the Court; and

5.      Order such other relief as is necessary and appropriate.

## JURY TRIAL DEMAND

The Commission hereby demands a jury trial as to all issues so triable.

This ___ day of July, 2017.

> Walter Jospin
> Regional Director
> Georgia Bar No. 405450
> jospinw@sec.gov
>
> M. Graham Loomis
> Regional Trial Counsel
> Georgia Bar No. 457868
> loomism@sec.gov
>
> Robert K. Gordon
> Senior Trial Attorney
> Georgia Bar No. 302482
> gordonr@sec.gov

s/ Joshua A. Mayes
Joshua A. Mayes
Senior Trial Attorney
Georgia Bar No. 143107
mayesj@sec.gov

United States Securities & Exchange Commission
950 E. Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
404-842-7600

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification to all counsel of record in this case.

This ___ day of _____, 2017.


/s/ _____